Brockenbrough, J.
dissented, and in the conference-room gave his reasons to the following effect:
The question in the present case is, whether a master may be indicted and punished by fine and imprisonment for the immoderate, cruel and excessive beating of his own *687 slave. It has fallen to my lot to differ in opinion from the re-t of my brethren, and it, behoves me to state briefly the reasons which have induced me to form that opinion; partienlary, as on one occasion within a few years past, in one of the Courts of my circuit, I sustained an Indictment of this character, and pronounced judgment against the defendant.
It will not be denied that, from the first introduction of slaves into this Colony in the year 1620, to the year 1669, the homicide, of a slave by his master, whether it was murder or manslaughter, was by law punishable as felony. This is apparent from the language of the statute passed in 1669, by which it is declared, that if a slave resist his master, and by the extremity of the correction should chance to die, his death shall not be accounted felony. If the master had possessed entire control over his slave, even to life and death, or if the manslaughter of a slave had been no crime, that statute would have been unnecessary. By what law, then, was this offence prevented, and what was the Code by which our ancestors of that period regulated the conduct, of the master towards his slave ? Not by the Jewish law, for there is not one word in the ancient charters or statutes, by which it can he inferred that it was adopted as the law of the Colony. Nor do 1 think it probable that the law of nations, or the laws of the Spartans, or the laws of the Roman Empire, (even if known to them,) constituted their rule of action. As to the first, it is sufficient to say, that it is laid down as a principle of that law, that the master has the power of life and death over his slave. Justinian’s insto Book I, title 0, § 1. This is a power which our ancestors did not claim, as is prove by the statute before mentioned. The laws of the Spartans seem to be still more inhuman. If they resorted to the Roman Code, they found a Afferent rulo. By that law, masters were not only» restrained from killing their slavey, but by a constitution of Jlntoninus it waa ordained, that If the severity of masher-; should be found ¡lo kv osee.®stye. *688 they should be compelled to part with their slaves on equitable terms. Their power over them was to cease, and this was founded on the principle, that no one should be allowed to misuse even his own property. Just. Inst. B. 1, tit. 8, §2. ^g the two first, a greater power was conferred than they claimed, so by the last, a penalty was annexed to the exercise of severity, which to them was probably unknown. It is not probable that they resorted to these strange laws, when they had one which they brought with them from the Mother Country, with which they were familiar, and which might be easily adapted to all the varying relations of their society. This was the common law of England. It is true, that to the common law, slavery, except in the modified form of villenage, was unknown. But, the relations of superior and inferior, had their rules well established by that law. A master had the power to correct his servant; a parent, his child; and a tutor, his pupil; but the moment either of these persons transcended the bounds of due moderation, he was amenable to the law of the land, and might be prosecuted for the abuse of his authority, for his cruelty and inhumanity. When slaves were introduced, although the power conferred on the master by that relation, was much greater than that conferred by either of the others, yet the common law would easily adapt itself to this new relation. The slave was the property of his master, and every power which was necessary to enable the master to use his property, was conferred on him. He might correct him for disobedience; he might sell him to another master; and he would be liable for the payment of his debts. If he was merely property, and nothing else, he might be destroyed by his master. But, to this extent the common law would not allow his power to reach, because it was unnecessary for his full enjoyment of the right of property. The slave was not only a thing, but a person, and this well-known distinction would extend its protection to the slave as a person, except so far as the application of it conflicted with the enjoyment of *689 the slave as a thing. Upon this ground, was his life protected: on this ground, I apprehend, his person was protected from all unnecessary, cruel, and inhuman punishments. I see no incompatibility between this degree of protection, and the full enjoyment of the right of property.
If I am asked what evidence there is that such was the law before the year 1669,1 answer, that there are no reports of the adjudications of our Courts during that period; but this we know, that the common law was the Code of Virginia, and that its rules prevailed, unless they were repealed by legislative enactment, or dispensed with as being incompatible with the new relation created by the introduction of slaves.
In the long period between 1669 and 1788,1 admit that this question could not have arisen. I admit, that whilst a statute existed which exempted a master from punishment for killing his slave, by reason of a blow given during his correction, or for the manslaughter of a slave, any beating, however cruel and severe, could not be the subject of a prosecution. But, this ferocious and sanguinary system of legislation was abolished by the act of November, 1788. 12 Hen. Stat. at Large, 681. By that repeal, the common law was expressly revived: by that repeal, that law again extended its aegis over the slave to protect him from all inhuman torture, though that torture should be inflicted by the hand of a master.
I had not supposed that I was stretching the principles of the common law to an unreasonable and unprecedented extent. I had supposed that if, in England, the mere attempt, though ineffectual, to commit a felony, or the solicitation to commit one, be a misdemesnor, (3 Bac. Ab. 549;) if an Indictment will be allowed in Massachusetts for poisoning a cow, (1 Mass. T. Rep. 59;) or in Pennsylvania for killing a horse, (1 Dall. 335,) an Indictment might be sustained in Virginia for maliciously and inhumanly beating a slave almost to death. In other words, I had sup *690 posed, that whilst the common law protected all persons in the just exercise of any authority or power conferred on them by the law; yet, for the abuse of that authority, or an exeess in the exercise of it, they were liable to be prose» cuteci as delinquents.
I have not thought it necessary to say any thing on the subject of the consequences of the doctrine which I have supported. I do not believe, that in those consequences any thing can be discerned injurious to the peace of society. When it is recollected, that our Courts and Juries are composed of men who, for the most part, are masters, I cannot conceive that any injury can accrue to the rights and interests of that class of the community. And with respect to the slaves, whilst kindness and humane treatment are calculated to render them contented and happy, is there no danger that oppression and tyranny, against which there is no redress, may drive them to despair ?
My opinion is, however, overruled by the better judgment of all the rest of the Court, and the demurrer to the Indictment is to be sustained.